

# IN THE
# TENTH COURT OF APPEALS

### No. 10-12-00110-CR

**ALFONSO HERNANDEZ,**

**Appellant**

 **v.**

**THE STATE OF TEXAS,**

**Appellee**

## From the 278th District Court
## Walker County, Texas
## Trial Court No. 25,353

## MEMORANDUM  OPINION

A jury found Appellant Alfonso Hernandez guilty of cruelty to nonlivestock animals and assessed his punishment at two years' confinement in a state-jail facility and a $1,000 fine.  This appeal ensued.

### Factual Background

Marcus Luttrell testified that in the early morning hours of April 1, 2009, he let his therapy dog DASY outside.[1]  The dog had no injuries at that time.  Luttrell subsequently heard a gunshot and grabbed his pistol.  He first went next door and checked on his mother.  Luttrell then

---

[1] Luttrell, a former Navy SEAL, said that DASY was an acronym that he created out of the names of his four-member reconnaissance team (three of whom were killed) in a 2005 mission in Afghanistan.

made his way to the road and saw a car, his dog laying in the ditch, and two men standing outside the car. The men got in the car and started driving off, talking and laughing. Luttrell checked on DASY, but she was dead. He then ran and got in his truck, began chasing the car, and called 9-1-1. Luttrell chased the car from Walker County to Polk County, where it was stopped by police.

Just before Hernandez's trial began, Michael Edmonds made an open plea of guilty. Edmonds testified that Hernandez picked him up at his house and they went "riding around" and "hunting," which they did frequently. Edmonds said that Hernandez had a shotgun and that Hernandez used it to shoot a dog. Later, they picked up Hernandez's brother Arturo and Arturo's friend Caleb McGough. They all went back to Edmonds's house to get another gun (Edmonds's .357 handgun) and then continued "driving around." McGough was driving; Hernandez and Edmonds were in the backseat. Edmonds testified that a dog started chasing the car at some point and he shot her with his .357. McGough turned the car around and went back to where the dog had fallen in the road. Hernandez, Arturo, and McGough got out of the car.

Edmonds testified that Hernandez then repeatedly hit the dog with a wooden baseball bat that had been in the backseat of the car. Edmonds said, "[T]hey kicked it, hit it" while laughing. They then got back in the car and continued up the road. Edmonds noticed that someone was coming up behind them very quickly. During the chase, Hernandez told Edmonds to get rid of his gun, and Edmonds threw his .357 out the window. Edmonds described the scene in the car as "chaos": "you have somebody chasing you with a gun, and obviously you're scared, and you're trying to get rid of your gun and all the other stuff that you have on you." Hernandez folded down the back seat and put his shotgun in the trunk before they were ultimately stopped by the police.

Arturo testified that he, Hernandez, Edmonds, and McGough left Edmonds's house to go "riding around" and to smoke marijuana. A dog started chasing the car, and he heard a gunshot. Edmonds told McGough, who was driving, "Just reverse, I want to see what I got." McGough backed up. Edmonds got out of the car and started laughing. Arturo said that no one used a baseball bat. Edmonds got back in the car, and they drove off. They ended up in a high-speed chase and were eventually stopped by the police.

Texas Ranger Steven Jeter testified that when he interviewed Hernandez, Hernandez told him that he, Edmonds, Arturo, and McGough decided to do a little "road hunting." Jeter's audio-recorded interview with Hernandez was admitted as evidence and played for the jury. In the interview, Hernandez told Jeter that he had never shot a dog. He said that Edmonds shot Luttrell's dog from the car and then got out of the car and looked at the dog. Luttrell's dog was the second dog Edmonds had shot that night. Hernandez said that Edmonds threw his gun out the window and that Hernandez's shotgun was put in the trunk. Elzie Parrish, patrol sergeant for the Onalaska Police Department in Polk County at the time of the incident, testified that when he searched Hernandez's car that night, he found the shotgun in the trunk. He found no baseball bat in the car.

Walker County Sheriff's Deputy Stephen Casper testified that he had been at the scene that night and had taken several photos of the dog. Casper confirmed that the dog suffered a gunshot wound. When asked if he could identify in the photos any other wounds on the dog other than the gunshot wound, he replied that one of the front legs looked a little swollen and that the neck looked a little more swollen than average. He also said that the legs of the dog appeared to have blunt-force injuries. He stated that a necropsy was not performed on the dog.

Finally, Stephenie Vallie testified that she has been the owner and operator of Magnolia

Boarding Kennels since 1989 and, before that, was a narcotic canine sergeant for the prison system for fourteen years. She has also volunteered and been employed by Texas Hearing and Service Dogs for numerous years, which involved training service dogs for the disabled. Vallie stated that a lot of her training in dealing with dogs has come from the amount of time that she spends with dogs but that she has also attended numerous classes and education programs. She has trained people to train dogs. In all her years of dealing with dogs and training dogs, she has also seen dogs that have been shot, beaten, abused, hit by a vehicle, and injured accidentally. On cross-examination, however, Vallie acknowledged that she is not a gunshot expert, is not a blood-spatter expert, and does not know how to perform a necropsy.

When she looked at the photographs of DASY, the first things she noticed were the way that DASY was laying, the blood, the coloration of the hair, the different patterns of the hair, and the way that the mouth was opened slightly. Vallie explained that those things meant that the dog did not die instantly, "just basically trauma." Vallie testified that DASY suffered trauma other than the gunshot wound and specifically identified an injury on the dog's leg. Vallie stated that the leg injury was consistent with an injury she had seen to a narcotic dog that had been beaten with a bat and had several broken bones. She also described some of the trauma as having a "cylindrical pattern."

### Ineffective Assistance of Counsel

In what appears to be two issues with several sub-issues, Hernandez contends that he received ineffective assistance of counsel and that he was harmed by such ineffective assistance. To prevail on an ineffective assistance of counsel claim, the familiar *Strickland v. Washington* test must be met. *Wiggins v. Smith*, 539 U.S. 510, 521, 123 S.Ct. 2527, 2535, 156 L.Ed.2d 471 (2003) (citing *Strickland v. Washington*, 466 U.S. 668, 687, 104 S.Ct. 2052, 2064, 80 L.Ed.2d

674 (1984)); *Andrews v. State*, 159 S.W.3d 98, 101-02 (Tex. Crim. App. 2005) (same).  Under *Strickland*, the appellant must prove by a preponderance of the evidence that (1) counsel's performance was deficient, and (2) the defense was prejudiced by counsel's deficient performance.  *Wiggins,* 539 U.S. at 521, 123 S.Ct. at 2535; *Strickland,* 466 U.S. at 687, 104 S.Ct. at 2064; *Andrews,* 159 S.W.3d at 101.  Absent both showings, an appellate court cannot conclude that the conviction resulted from a breakdown in the adversarial process that renders the result unreliable.  *Thompson v. State*, 9 S.W.3d 808, 813 (Tex. Crim. App. 1999).

The appellate court looks to the totality of the representation and the particular circumstances of each case in evaluating the effectiveness of counsel.  *Id.*  There is a strong presumption that counsel's actions and decisions were reasonably professional and motivated by sound trial strategy.  *See Salinas v. State*, 163 S.W.3d 734, 740 (Tex. Crim. App. 2005); *Stults v. State*, 23 S.W.3d 198, 208 (Tex. App.—Houston [14th Dist.] 2000, pet. ref'd).  To overcome the presumption of reasonably professional assistance, any allegation of ineffectiveness must be firmly founded in the record, and the record must affirmatively demonstrate the alleged ineffectiveness.  *Thompson*, 9 S.W.3d at 813.  When the record is silent regarding the reasons for counsel's conduct, a finding that counsel was ineffective would require impermissible speculation by the appellate court.  *Gamble v. State*, 916 S.W.2d 92, 93 (Tex. App.—Houston [1st Dist.] 1996, no pet.) (citing *Jackson v. State*, 877 S.W.2d 768, 771 (Tex. Crim. App. 1994)).  Therefore, absent specific explanations for counsel's decisions, a record on direct appeal will rarely contain sufficient information to evaluate an ineffective-assistance claim.  *See Bone v. State*, 77 S.W.3d 828, 833 (Tex. Crim. App. 2002).

Hernandez argues that his trial counsel's performance was deficient because he failed to object to Vallie's testimony "on the grounds that it was an opinion or conclusion of a person not

qualified as an expert witness in either veterinary medicine or in necropsy" under Rules of Evidence 701 and 702. The record is silent as to trial counsel's reasons for his actions and decisions. To conclude that trial counsel was ineffective for failing to object to Vallie's testimony would therefore call for speculation, which we will not do. *See Jackson*, 877 S.W.2d at 771; *Gamble*, 916 S.W.2d at 93.

Hernandez argues that even with the silent record, the presumption of sound trial strategy should be overcome because Vallie's testimony was proffered to corroborate the testimony of his alleged accomplice Edmonds. And if Vallie's testimony were excluded, then Hernandez would be entitled to an instructed verdict of acquittal because Edmonds's testimony would not be corroborated. *See* TEX. CODE CRIM. PROC. ANN. art. 38.14 (West 2005) ("A conviction cannot be had upon the testimony of an accomplice unless corroborated by other evidence tending to connect the defendant with the offense committed; and the corroboration is not sufficient if it merely shows the commission of the offense."). Hernandez's appellate counsel states, "The undersigned counsel knows of no Defense trial strategy where one willingly gives up on such a possibility."[2]

But this position overlooks Casper's testimony, which was very similar to Vallie's testimony in that he described several other injuries on the dog besides the gunshot wound, including blunt-force injuries.[3] Other evidence also tends to connect Hernandez to the offense,

---

[2] In the absence of evidence of trial counsel's reason for the challenged conduct, we assume a strategic reason for trial counsel's conduct, if one can be imagined. *Garcia v. State,* 57 S.W.3d 436, 440 (Tex. Crim. App. 2001) ("[A]n appellate court 'commonly will assume a strategic motivation if any can possibly be imagined,' and will not conclude the challenged conduct constituted deficient performance unless the conduct was so outrageous that no competent attorney would have engaged in it.") (quoting 3 W. LAFAVE, ET AL., CRIMINAL PROCEDURE § 11.10(c) (2d ed. 1999) and citing *Thompson*, 9 S.W.3d at 814).

[3] Hernandez's trial counsel did not object to Casper's initial description of the dog's other wounds but did object that Casper was not an expert when Casper was asked to describe what kind of wounds they were. That objection was initially overruled, but the trial court then ruled that Casper could describe the wounds but could not opine on their

including his own interview with Jeter.[4]  *See Gill v. State*, 873 S.W.2d 45, 48 (Tex. Crim. App. 1994) ("All that is required is that there be *some* non-accomplice evidence which *tends* to connect the accused to the commission of the offense alleged in the indictment.").  Thus, without evidence as to trial counsel's reasons for his actions and decisions, we must conclude that Hernandez has not overcome the presumption that trial counsel's decision not to object to Vallie's testimony on the grounds that it was an opinion or conclusion of a person not qualified as an expert witness in either veterinary medicine or in necropsy was reasonably professional and motivated by sound trial strategy.[5]  *See Salinas*, 163 S.W.3d at 740; *Gamble*, 916 S.W.2d at 93.

For these reasons, we overrule Hernandez's issues and affirm the trial court's judgment.

REX D. DAVIS
Justice

Before Chief Justice Gray,
      Justice Davis, and
      Justice Scoggins
Affirmed
Opinion delivered and filed March 27, 2014
Do not publish
[CR25]

---

causes.  Hernandez does not complain of that ruling on appeal, nor does he assert that trial counsel was ineffective in failing to object to Casper's initial description.

[4] Excluding Vallie's testimony, the evidence that tends to connect Hernandez to the offense and corroborates Edmonds's testimony includes the following:  Hernandez admitted to road hunting by shooting other animals.  Although he reported that Edmonds killed the other dog, Hernandez continued to ride around hunting with him.  Hernandez was riding in the backseat of his own car with his shotgun while letting someone else drive at the time DASY was shot.  In his interview with Jeter, Hernandez stated that Edmonds told him to "get back in the car" and he "got back inside the car," indicating that he was out of the car when Edmonds was observing DASY's body.  Luttrell stated that he saw two men outside the car over DASY.  And again, Casper testified to the appearance of the gunshot wound but also indicated that there were other injuries to the dog.

[5] The jury charge contained a charge on the law of parties; therefore, Hernandez was criminally responsible for the offense if "acting with intent to promote or assist the commission of the offense, he solicit[ed], encourage[d], direct[ed], aid[ed], or attempt[ed] to aid the other person to commit the offense."  TEX. PENAL CODE ANN. § 7.02(a)(2) (West 2011).  We also agree with the State's contention that, because Hernandez was tried as a party to the offense of shooting the dog with a firearm, the State did not have to prove that Hernandez beat the dog with a baseball bat.  And because Hernandez has not challenged on appeal the sufficiency of the evidence to support his conviction as a party to the offense, he therefore cannot show prejudice or harm on his ineffective-assistance claim with respect to Vallie's testimony about the other trauma to DASY.